1

2

3

4              IN THE UNITED STATES DISTRICT COURT

5              FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7   SHARON SAUNDERS, et. al,                    CASE NO. CV F 04-5924 LJO WMW

8              Plaintiff,                       **SUMMARY JUDGMENT/ADJUDICATION**
                                                **DECISION**
9        vs.                                    (Docs. 141, 153, 158, 171, 178, 189.)

10  CYNTHIA KNIGHT, et. al,

11             Defendants.
    _____/

12

13                          **INTRODUCTION**

14       Defendants[1] seek summary judgment on pro se plaintiff Sharon Saunders' ("Ms. Saunders'") 42

15  U.S.C. § 1983 ("section 1983") claims arising from her arrest, search and activities in a suspected

16  endless chain scheme.  Ms. Saunders seeks summary adjudication that defendant Fresno County

17  Sheriff's Department Detective Cynthia Knight ("Detective Knight") violated Ms. Saunders' First and

18  Fourth Amendment rights by wrongly targeting Ms. Saunders and obtaining a search and arrest warrant

19  for Ms. Saunders.  This Court considered the parties' summary judgment/adjudication motions on the

20  record,[2] pursuant to this Court's Local Rule 78-230(h).  For the reasons discussed above, this Court

21

22       [1]      Defendants are 11 Fresno County Sheriff's Department peace officers and will be referred to collectively
    as "defendants."

23

24       [2]      This Court carefully reviewed and considered all arguments, points and authorities, declarations,
    depositions, exhibits, statements of undisputed facts and responses thereto, objections and other papers filed by the parties.
    Omission of reference to an argument, document, paper or objection is not to be construed to the effect that this Court did
25  not consider the argument, document, paper or objection.  This Court thoroughly reviewed and considered the evidence it
    deemed admissible, material and appropriate for summary judgment/adjudication.

26

27       As noted by defendants, the scope of Ms. Saunders' summary adjudication motion is unclear.  Based on Ms.
    Saunders' papers, this Court construes Ms. Saunders' summary adjudication motion to address Detective Knight's alleged
    constitutional wrongs.  Nonetheless, since this Court grants defendants summary judgment on all of Ms. Saunders' claims,
28  the scope of her summary adjudication motion is unavailing.

                                   1

1  GRANTS defendants summary judgment on Ms. Saunders' claims.

2  **BACKGROUND**

3  **The Parties**

4  In late 1998, Ms. Saunders began to participate in the organization Constitutional Colleagues in

5  Granite ("CCG").  Detective Knight lead an investigation into CCG as an endless chain scheme in

6  violation of California Penal Code section 327 ("section 327") and obtained arrest and search warrants

7  for CCG participants, including Ms. Saunders.  Defendant Richard Pierce ("Sheriff Pierce") became the

8  Fresno County Sheriff after nearly all of Detective Knight's pre-search investigation and a day prior to

9  execution of the search and arrest warrants regarding CCG.  Defendant Kenneth Bowden ("Deputy

10  Bowden") is an deputy sheriff with the Fresno County Sheriff's Department ("Department") and

11  conducted surveillance and assisted to serve search and arrest warrants regarding CCG.  Defendant

12  Department Deputy Sheriff Mark Chapman ("Deputy Chapman") placed Ms. Saunders into custody and

13  assisted with searches but was not involved in pre-search and pre-arrest investigation into CCG.

14  Defendants Department Lieutenant Neil Dadian ("Lt. Dadian"), Department Sergeant Dale Baumann

15  ("Sgt. Baumann"), Department Sergeant Janice Rasmussen ("Sgt. Rasmussen"), Department Deputy

16  Sheriff Patrick Hanson ("Deputy Hanson"), Department Deputy Sheriff Earl Richardson ("Deputy

17  Richardson"), Department Deputy Sheriff Juan Espinoza ("Deputy Espinoza"), and Department

18  Detective Michael Severson ("Detective Severson") assisted with search warrant execution but were not

19  involved in pre-search and pre-arrest investigation into CCG.

20  **Investigation Into CCG**

21  In December 1998, the Department received a flyer entitled "E.V.A. 16 Week Fast Tract to

22  Wealth," which explained and included a diagram of money participants could make to recruit people

23  "downline."  Handwritten at the flyer's bottom was "Pete Plitt (sheriff) 277-2940.  Ask about meetings

24  Thursday evenings 6:45."

25  Department Sergeant James Morley ("Sgt. Morley") of the Department's vice/intelligence unit

26  decided to investigate CCG and assigned Detective Knight, a vice/intelligence detective since 1990, to

27  lead the CCG investigation.  Defendants characterize Detective Knight as "well-trained" with experience

28  investigating "endless chain" schemes.  Sgt. Morely, Detective Knight and Deputy Bowden comprised

2

1    the vice/intelligence unit.

2          On December 10, 1998, Detective Knight telephoned the number on the flyer and contacted Pete

3    Plitt ("Mr. Plitt"), who stated that he was a deputy sheriff and that CCG was a multi-level marketing

4    program.  Mr. Plitt stated that: (1) he had been involved with CCG for a month and had made $600; (2)

5    CCG's "lessons" were based on the National Center for Constitutional Studies; and (3) his church was

6    involved and CCG was "a vehicle to take the money out of the hands of the sinners and into the hands

7    of the righteous."  Mr. Plitt invited Detective Knight to attend a December 12, 1998 meeting at which

8    CCG founder Jerry Thorstad ("Mr. Thorstad") and Fresno CCG operator Blaine Williams ("Mr.

9    Williams") would speak.

10                                        ***CCG Meetings***

11         A citizen informant "Sioux" attended the December 12, 1998 meeting as "Cindy Kaufman" and

12   wore a recording device.  Sioux observed displayed CCG materials and received materials from Mr.

13   Plitt, including a booklet of the "Split-Second Marketing Program" and a piece of paper stating that the

14   program is "hassle free: NO product inventory, monthly quotas, bookwork, deliveries or shipping, retail

15   selling, volume requirements, etc."

16         Mr. Williams explained his multi-level marketing experience and how he became involved in

17   CCG. Mr. Williams noted that he had his first CCG meeting at Ms. Saunders' home in November 1998.

18   Mr. Williams explained the payment scheme by which participants received money from enrollees

19   downline and that "lessons" were paid for by CCG withholding money a participant earned.  More

20   specifically, Mr. Williams explained that:

21         1.    Each CCG enrollee paid a $50 enrollment fee, half of which goes to the CCG participant
22               who enrolled the enrollee and half to CCG;

23         2.    Each enrollee paid $75 for "tuition," entitling the enrollee to a starter kit with materials
24               to enroll at least three more persons and lesson number one (video/audio materials on the
25               Constitution);

26         3.    When a participant enrolled three more persons, he/she received $25 per enrollee and $15
27               out of each enrollee's tuition;

28         4.    The participant's sponsor received $15 for each new enrollee and that persons upline

                                              3

1    received $15 out of the tuition; and

2        5.     CCG's scheme had seven levels with a graduating level of pay for levels above level

3               number three.

4  Mr. Williams noted that CCG wanted "width," that is, three or more enrollees so that persons downline

5  would pay more and faster.  According to Mr. Williams, at level five, there would be 1,364 persons in

6  a participant's downline to result in $27,280 for the participant.

7        Mr. Thorstad spoke at the December 12, 1998 meeting and stated "when you reach a level the

8  company mails it to you.  It's more like catalogue sales.  In the first course there are five sales for

9  everyone you enroll."  Mr. Thorstad continued that "you don't have to understand it, just believe in it."

10        At the end of meeting, Sioux gave Mr. Plitt $125 to enroll in CCG.  Mr. Plitt stated that a starter

11  kit would arrive in the mail and encouraged Sioux to attend a December 15, 1998 meeting at Fashion

12  Fair Mall ("Fashion Fair").

13        On December 14, 1998, Alcohol Beverage Control agent Lars Oaklander ("Agent Oaklander")

14  attended a CCG meeting at a Fresno residence.  At the meeting, Mr. Williams stated:

15        1.     The $125 investment was required because the CCG system did not work without a flow

16               of money into it;

17        2.     CCG was not marketed as a constitutional program but as a business in which a person

18               could make serious money;

19        3.     People were brought into CCG because they were motivated by greed; and

20        4.     Former deputy sheriff Dan Furtney ("Mr. Furtney") was successful despite his law

21               enforcement background and previous failed business ventures.

22  At the meeting, Mr. Furtney represented that CCG was legal.  Agent Oaklander paid Mr. Thorstad $125

23  to enroll into CCG.

24        On December 15, 1998, Sioux attended the CCG meeting at the Fashion Fair Community Room

25  ("meeting room") and wore a recording device.  Mr. Plitt informed Sioux that: (1) she was being placed

26  in his downline; (2) he had recently received $700; (3) Ms. Saunders was "plugged in" under Mr. Plitt;

27  (4) the first meeting was at Ms. Saunders' home; (5) and 250 people had enrolled during the previous

28  five weeks.

4

Mr. Thorstad noted that CCG involved a pyramid but that CCG was different because it had a "viable product." Mr. Thorstad admitted that he lacked a set price for Constitutional tapes for persons who did not want to invest in CCG. Ms. Saunders introduced Mr. Thorstad and Mr. Williams to the audience and stated that her family was "all in this with me. We're amazed."

Detectives stationed in the Fashion Fair parking lot located three vehicles which had been seen at the previous day's CCG meeting and including a Ford Explorer[3] and Dodge van with the license plate "FURTNEY." Detectives further observed Mr. Williams and others load items into the vehicles.

On December 22, 1998, Detective Knight attempted to attend a CCG meeting at Fashion Fair but was unable to do so due to Mr. Furtney's presence and her possible exposure as a detective. Detectives on surveillance saw Mr. Saunders arrive in the Ford Explorer at Fashion Fair and take five boxes inside the mall. Detectives observed Ms. Saunders later arrive at Fashion Fair and enter to attend the meeting.

On December 29, 2007, volunteer informant "Storm Lake" attended a CCG meeting and posed as "Bob Kaufman," brother of Cindy Kaufman (Sioux). Storm Lake heard Mr. Williams give the same speech as he had given at the three previous CCG meetings which the Department had infiltrated. Mr. Furtney again represented to attendees that CCG was legal. Storm Lake met with Mr. Plitt who showed Storm Lake video and audio literature. At the end of meeting, Storm Lake gave Ms. Saunders $125 to join CCG, and Ms. Saunders provided a receipt.

The Department's vice/intelligence unit reviewed materials received by Sioux and informant tape recordings. Mr. Thorstad represented on tape: "Ours is so simple, because we don't really sell a product, what we do is enroll members. If you like you can go out and sell these products, but in a way that is foolish because for $100 people can get in this business and get the whole course and it doesn't cost them a thing." Mr. Thorstad also represented that CCG pays every two weeks, and when a participant is paid, he/she receives a printout with information on downline participants.

### Further Information

Defendants note that Mr. Thorstad, to circumvent the issue of underfunding, invented

---

[3]    The Ford Explorer was later ascertained to belong to Merlin Saunders ("Mr. Saunders"), Ms. Saunders' husband.

1    "compression from the bottom," to plug new people into holes on upper levels before the bottom level

2    is reached. Mr. Williams represented that he made $2,000 the previous month and twice as much during

3    the current month.  Mr. Furtney noted that he had 50-75 participants in his downline.

4    **Search And Arrest Warrants Issuance**

5    Detective Knight received information that CCG would meet at Fashion Fair on January 5, 1999

6    at 7 p.m.  Detective Knight requested search warrants for the Fashion Fair meeting room, residences of

7    Ms. Saunders, Mr. Williams, Mr. Plitt and Mr. Furtney, and several vehicles based on what Detective

8    Knight characterized as probable cause that evidence of violation of section 327 would be found.

9    Department Detective Richard Ko ("Detective Ko") requested Ms. Saunders' arrest warrant and prepared

10    a probable cause statement for her arrest.  Fresno County Superior Court Judge Lawrence Jones ("Judge

11    Jones") signed a January 4, 1999 search warrant and Ms. Saunders' arrest warrant.  The search warrant

12    included Detective Knight's 14-page probable cause affidavit, Attachment A to describe locations and

13    vehicles to be searched, and Attachment B to describe property to be seized.

14    Detectives Knight and Ko surmised from the evidence that the CCG scheme was based on

15    enrolling members, that the product was incidental to the scheme, and that Ms. Saunders operated a local

16    CCG scheme.  Defendants point out that: (1) Detective Knight is the only defendant who played a

17    significant role in probable cause determinations; (2) Deputy Bowden did not play a role in the probable

18    cause determination regarding CCG operators; and (3) that no other defendants were involved in the

19    underlying investigation into CCG.

20    **Search And Arrest Warrant Execution**

21    Detective Knight's superiors approved a January 5, 1999 execution of the search and arrest

22    warrants.  Department officers assigned to assist with the warrants' execution were advised about the

23    warrants and were provided general information about the search warrant's nature, locations to be

24    searched, suspects who resided in or had personal property at to be searched locations, items to be

25    seized, and information supporting probable cause for the search warrant.

26    At 6:24 p.m. on January 5, 1999, vice/intelligence unit surveillance observed Mr. and Ms.

27    Saunders delivering meeting-related items inside Fashion Fair.  At 7:45 p.m., Sgt. Morley and Deputy

28    Bowden knocked on the doors of the Fashion Fair meeting room and announced their presence, and

1   attendees opened the meeting room doors.  Department officers entered, without their service weapons

2   drawn, and secured and searched the meeting room.  Department officers took an inventory of seized

3   items.

4        Department officers served Ms. Saunders, Mr. Williams and Mr. Blaine with arrest warrants.

5   Deputy Chapman arrested Ms. Saunders and told her she was arrested for violation of section 327.  Ms.

6   Saunders requested her purse which sat on a meeting room table.  Ms. Saunders' daughter handed to

7   Deputy Chapman Ms. Saunders' purse.  Ms. Saunders claims that after she was arrested, Deputy

8   Chapman and Department Deputy Sheriff Linda Lenton ("Deputy Lenton") pushed Ms. Saunders from

9   behind as she was escorted outside Fashion Fair.

10       Outside of Fashion Fair, Ms. Saunders identified the Ford Explorer as Mr. Saunders' vehicle.

11  Mr. Saunders provided Deputy Chapman a key to search the Ford Explorer.  Ms. Saunders stood in front

12  of the Ford Explorer as Lt. Dadian or Deputy Lenton searched Ms. Saunders' purse.  At around 8 p.m.,

13  Deputy Lenton initiated search of the Ford Explorer and Deputy Chapman took inventory of items in

14  the Ford Explorer.  Due to cold weather, Ms. Saunders was placed in the vehicle of Lt. Dadian, who

15  denied Ms. Saunders' request to loosen her handcuffs which Ms. Saunders claims were uncomfortable.

16       The search of the Ford Explorer was concluded around 8:50 p.m. and its key returned to Mr.

17  Saunders.  Mr. Saunders was instructed to follow Department officers to Mr. Saunders' home.  Ms.

18  Saunders was transported to her home in a patrol car and arrived there around 9:18 p.m.  Department

19  officers who responded to Mr. and Ms. Saunders' home were Lt. Dadian, Sgts. Rasmussen and

20  Baumann, Deputies Bowden, Chapman, Lenton, Richardson, Hanson and Espinoza, and Detective

21  Severson.

22       Ms. Saunders provided a key to her residence and was brought inside, where her handcuffs were

23  loosened and brought to Ms. Saunders' front.  The search of Mr. and Ms. Saunders' home proceeded,

24  Mr. Saunders was shown a two-page document from the search warrant, and residence occupants were

25  detained during the search.  The residence search required approximately two hours.  Ms. Saunders

26  claims that Deputy Espinoza seized several television cable boxes, which Ms. Saunders did not own,

27  and accused Ms. Saunders of violating the law.  Ms. Saunders was transported to the Fresno County Jail

28  and was booked at approximately 12 a.m. on January 6, 1999.

**Post-Arrest Events**

On April 9, 1999, the Fresno County District Attorney's Office ("D.A.'s Office")filed a criminal complaint against Ms. Saunders in an underlying Fresno County Superior Court criminal action ("criminal action") to allege Ms. Saunders violated section 327.  Ms. Saunders waived her right to a speedy trial.  At a July 7, 2003 preliminary hearing, the criminal action was dismissed against Ms. Saunders based on absence of probable cause to hold Ms. Saunders for trial.

Ms. Saunders notes that the bruising from the handcuffs healed "in a relatively short period of time."  Defendants note the absence of pertinent evidence of disruption in her family relationship resulting from events at issue here.

**Ms. Saunders' Claims**

On July 2, 2004, Ms. Saunders filed this action to allege claims arising out of defendants' execution of search and arrest warrants.  Ms. Saunders proceeds under section 1983 on her second amended complaint to allege:

1. A (first) First Amendment violation cause of action that defendants deprived her freedoms to assemble, associate and contract;

2. A (second) Fourth Amendment violation cause of action that defendants subjected her to unreasonable searches and seizures of her person, home and property without reasonable or probable cause;

3. A (third) Fifth Amendment violation cause of action that defendants deprived her of life, liberty or property without due process; and

4. A (fourth) Fourteenth Amendment violation cause of action that defendants deprived her of life, liberty or property without due process and denied her equal protection of the laws.

Ms. Saunders seeks compensatory and punitive damages.

Defendants seek summary judgment that Ms. Saunders lacks evidence to support her claims, that Ms. Saunders' claims are legally barred and that defendants are entitled to qualified immunity.

/ / /

/ / /

8

**DISCUSSION**

**Summary Judgment/Adjudication Standards**

F.R.Civ.P. 56(a) permits a party seeking to recover on a claim to seek summary judgment "in the party's favor upon all or any part thereof." F.R.Civ.P. 56(b) permits a party against whom a claim is asserted to seek "summary judgment in the party's favor upon all or any part thereof." Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law. F.R.Civ.P. 56(e); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d

9

563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *See Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Under F.R.Civ.P. 56(c), a summary judgment/adjudication motion, interlocutory in character, may be rendered on the issue of liability alone. "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v.*

1  *Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant

2  summary adjudication as to specific issues if it will narrow the issues for trial."  *First Nat'l Ins. Co. v.*

3  *F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

4  _____As discussed below, defendants have demonstrated an absence of evidence to support elements

5  of Ms. Saunders' claims and that they are entitled to qualified immunity and judgment as a matter of law.

6  **Unreasonable Search Claims**

7  ***Claim Preclusion***

8  Ms. Saunders alleges that she was subjected to unlawful searches in that, among other things,

9  "defendants exceeded the scope of authority of the alleged warrant."  Ms. Saunders claims that her

10  prosecution was "delayed without any substantial justification" until the July 7, 2003 preliminary hearing

11  where the trial court "ruled that there was no reasonable or probable cause to hold plaintiffs for trial on

12  the charge of Penal Code 327."  Ms. Saunders further alleges that preliminary hearing ruling "subjects"

13  defendants here to "the doctrine of res judicata and collateral estoppel on the legal issue and cause of

14  action alleged against them of violation of plaintiffs [sic] Fourth (4th) Amendment Federal Constitutional

15  right to not be subject to unreasonable searches and seizures without any reasonable or probable cause."

16  Ms. Saunders claims that defendants are "collaterally and equitable [sic] estopped from asserting any

17  legal defense . . . as the issue has already been litigated once."

18  Defendants contend that Ms. Saunders is not entitled to preclusive effect of the criminal action's

19  preliminary hearing rulings.  Defendants note that Ms. Saunders provides no authority that the criminal

20  action's orders have "preclusive effect on Fourth Amendment issues in this case."

21  "Collateral estoppel precludes relitigation of issues argued in prior proceedings."  *Lucido v.*

22  *Superior Court*, 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 769 (1990), *cert. denied*, 500 U.S. 920, 111

23  S.Ct. 2021 (1990).  Under collateral estoppel or the "issue preclusion" effect of res judicata, a party is

24  barred from raising an issue of fact or law if the issue was actually litigated and determined by a valid

25  and final judgment in a previous proceeding, and the determination was essential to the judgment; the

26  determination, in that instance, is conclusive in a subsequent action between the parties.  *Arakalian*

27  *Farms, Inc. v. Agricultural Labor Relations Board*, 49 Cal.3d 1279, 1289-1290, 265 Cal.Rptr. 162, 168

28  (1989). "[E]specially where collateral estoppel is applied 'offensively' to preclude a defendant from

relitigating an issue the defendant previously litigated and lost, the courts consider whether the party against whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue." *Roos v. Red,* 130 Cal.App.4th 870, 880, 30 Cal.Rptr.3d 446 (2005), *cert. denied*, 546 U.S. 1174, 126 S.Ct. 1341 (2006).

Collateral estoppel applies to the section 1983 context in that there is "no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court." *Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411 (1980). "A party's ability to relitigate an issue decided in a prior state court determination depends on the law of the state in which the earlier litigation occurred." *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1105 (10th Cir. 1998).

The party asserting collateral estoppel bears the burden to prove the doctrine's requirements. *First N.B.S. Corp. v. Gabrielsen*, 179 Cal.App.3d 1189, 1194, 225 Cal.Rptr. 254, 256 (1989). Threshold requirements to apply collateral estoppel are:

    1.    The issue sought to be precluded from relitigation must be **identical** to that decided in a former proceeding;

    2.    The issue must have been **actually litigated** in the former proceeding;

    3.    The issue must have been **necessarily decided** in the former proceeding;

    4.    The decision in the former proceeding must be **final and on the merits**; and

    5.    The party against whom preclusion is sought must be the **same as, or in privity with**, the party to the former proceeding.

*Lucido*, 51 Cal.3d 335, 341, 272 Cal.Rptr.2d 767, 769 (1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2021 (1990).

Defendants focus on the privity element and contend that defendant peace officers in a section 1983 action "are not in privity with the prosecution of a related criminal case." *See Davis v. Eide,* 439 F.2d 1077, 1078 (9th Cir. 1971), *cert. denied*, 404 U.S. 843, 92 S.Ct. 139 (1971) (insufficient privity to invoke collateral estoppel in that defendant police officers "had no measure of control whatsoever over the criminal proceeding and no direct individual personal interest in its outcome.") Defendants further point out that they did not testify in the criminal action's preliminary hearing and that Ms. Saunders has

1   provided insufficient information to determine whether collateral estoppel applies in the absence of

2   information as to what the trial court reviewed.  Defendants conclude that there is an absence of privity

3   since they did not actively litigate the criminal action.

4        Defendants are correct that there is an absence of evidence that they are in privity with the

5   prosecution in the criminal action.  Defendants investigated CCG and prepared and executed search

6   warrants.  Defendants exercised no measure of control over the criminal action and lacked a personal

7   interest in it.  Defendants did not appear as parties or witnesses in the criminal action.  The criminal

8   action's preliminary hearing rulings are not entitled to preclusive effect here.

9        Defendants further point out that probable cause to search or arrest "is different than the

10  determination as to whether a criminal defendant is to be held to answer."  Under California law, a

11  criminal defendant is not held to answer if "it appears either that no public offense has been committed

12  or that there is not sufficient cause to believe the defendant guilty of a public offense."  Cal. Pen. Code,

13  § 871.  Based on the California Penal Code section 871 standard, defendants point out that a prosecutor

14  at a preliminary hearing is held to a much more stringent standard than a police officer investigating

15  suspected criminal activity.  As such, defendants point to an absence of identical litigated issues in the

16  criminal action's preliminary hearing and this action to further demonstrate the absence of preclusive

17  effect of the preliminary hearing rulings.

18                                    ***Probable Cause***

19       Section 327 addresses endless chain schemes as follows:

20           Every person who contrives, prepares, sets up, proposes, or operates any endless
         chain is guilty of a public offense, and is punishable by imprisonment in the county jail
21       not exceeding one year or in state prison for 16 months, two, or three years.

22           As used in this section, an "endless chain" means any scheme for the disposal or
         distribution of property whereby a participant pays a valuable consideration for the
23       chance to receive compensation for introducing one or more additional persons into
         participation in the scheme or for the chance to receive compensation when a person
24       introduced by the participant introduces a new participant. Compensation, as used in this
         section, does not mean or include payment based upon sales made to persons who are not
25       participants in the scheme and who are not purchasing in order to participate in the
         scheme.
26

27       The Fourth Amendment establishes the right "to be secure in . . . persons, houses, papers, and

28  effects, against unreasonable searches and seizures" and mandates issuance of warrants with "probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." California Penal Code section 1524(a)(4) authorizes a search warrant's issuance when "the property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony."

In making a probable cause determination, a court's role is to ensure that the judge issuing the search warrant had a "substantial basis" to conclude probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2332 (1983); *United States v. Hendricks*, 743 F.2d 653, 654 (9th Cir. 1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362 (1985). "The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 103 S.Ct. 2317.

"[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Gates*, 462 U.S. at 235, 103 S.Ct. 2317 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584 (1969)). "The facts . . . must be sufficient to justify a conclusion . . . that the property which is the object of the search is probably on the person or premises to be searched at the time the warrant is issued." *Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968). In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 & n. 6, 98 S.Ct. 1970, 1976-1977 & n. 6 (1978); *United States v. Lalor*, 996 F.2d 1578, 1582 (9th Cir.), *cert. denied*, 510 U.S. 983, 114 S.Ct. 485 (1993). The nexus between the place to be searched and items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence. *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 841 (1989); *see United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983).

14

1  "The magistrate making the original determination of probable cause is accorded significant deference

2  by the reviewing court." *United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1996), *cert. denied*, 520

3  U.S. 1236, 117 S.Ct. 1836 (1997).

4       Defendants point out that ample evidence of an endless scheme was presented to Judge Jones

5  for issuance of the search warrant. CCG's predominant theme was the downline compensation without

6  having to work or maintain inventory. CCG enticed new enrollees with the promise of compensation

7  for enrolling others and subsequent enrollees down the line. CCG's products were irrelevant and

8  secondary to promotional materials and oral presentations.

9       Moreover, there was substantial evidence of Ms. Saunders' active CCG participation. The first

10  local CCG meeting was at her residence. Ms. Saunders was downline from Mr. Williams, a local CCG

11  spokesman. Ms. Saunders' participation included attending a sign-up table where CCG promotional

12  materials were placed. Ms. Saunders commented at the December 15, 1998 meeting that her family as

13  "all in this with me." Ms. Saunders accepted $125 from a citizen informant for CCG. Ms. Saunders

14  attended CCG meetings with Mr. Saunders, who delivered materials along with Ms. Saunders. Ms.

15  Saunders' attempts to dispute her section 327 guilt is unavailing because probable cause addresses

16  probability of criminal activity, not undeniable proof of criminal activity. The evidence supports that

17  property subject to search was probably on Ms. Saunders' person or her premises. Reason supported

18  that items to be seized would be found in places subject to Ms. Saunders' control. The evidence reveals

19  that Detective Knight's probable cause determination was reasonable, and this Court accords deference

20  to Judge Jones' probable cause determination. Probable cause supported Ms. Saunders' search warrant.

21                  ***Deliberate Or Reckless Disregard For Truth***

22       Ms. Saunders contends that Detective Knight "made several intentional, knowing, willing false

23  statements of material fact, misleading statements of material fact, in her statement of probable cause

24  for issuance of the search warrant." Ms. Saunders is hellbent to attack Detective Knight and

25  characterizes Detective Knight as a "knowing willful liar."

26       "There is, of course, a presumption of validity with respect to the [search warrant] affidavit."

27  *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674 (1978). A search warrant affidavit may be

28  challenged by "a substantial preliminary showing that a false statement knowingly and intentionally

[made], or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-156, 98 S.Ct. 2674. "Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. "Not all information in the government's possession need be included in the warrant affidavit." *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992). Omitted facts rise to misrepresentation only if omitted facts cast doubt on the existence of probable cause. *Garza*, 980 F.2d at 551.

A challenger of a search warrant "must make specific allegations that indicate the portions of the warrant claimed to be false." *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983). "[C]hallenged statements in the affidavit must be necessary to a finding of probable cause." *Kiser*, 716 F.2d at 1271. Ms. Saunders must establish a substantial showing of Detective Knight's deliberate falsehood or reckless disregard for the truth and that the magistrate would not have issued the search warrant without the dishonestly included or omitted information. *See Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995). "Put another way, the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause." *Hervey*, 65 F.3d at 789.

Ms. Saunders makes sweeping statements that Detective Knight misrepresented or omitted material facts from her probable cause affidavit. Ms. Saunders manufactures alleged misrepresentations and omissions which amount to no more than self-serving statements if not out-and-out support for probable cause. Ms. Saunders points to a litany of immaterial matters omitted from Detective Knight's probable cause affidavit. Construed most favorably to Ms. Saunders, the omitted matters do not rise even to negligence or innocent mistake. Several omitted matters referenced by Ms. Saunders enhance probable cause. Moreover, Ms. Saunders fails to demonstrate with reliable, admissible evidence that Detective Knight made misrepresentations in her probable cause affidavit. Ms. Saunders offers merely self-serving indictments of Detective Knight without substance. Ms. Saunders points to nothing to cast doubt on probable cause for the search warrant or that the search warrant should not have issued due to Detective Knight's falsehoods or reckless disregard for the truth.

### *Search Warrant Display*

Ms. Saunders alleges that the search warrant "was never produced during the time of the

1   preceding events culminating" in her arrest.  Ms. Saunders complains of "months" delay after her arrest

2   to be provided the search warrant.  Defendants argue that neither the Fourth Amendment nor California

3   law requires an officer executing a search warrant to display the search warrant or to provide a person

4   subject to search of copy of the search warrant.

5       "The United States Supreme Court has not interpreted the Fourth Amendment to the United

6   States Constitution as requiring the officer executing the search warrant to display the warrant or provide

7   defendant a copy of it."  *People v. Calabrese*, 101 Cal.App.4th 79, 84, 123 Cal.Rptr. 570, 573 (2002)

8   (citing *West Covina v. Perkins*, 525 U.S. 234, 240, 246, n. 1, 119 S.Ct. 678 (1999) (conc. opn. of

9   Thomas, J.)).  Furthermore, in California, "there is no statutory or constitutional requirement that a

10   search warrant be exhibited as a prerequisite to execute it."  *People v. Rodrigues-Fernandez*, 235

11   Cal.App.3d 543, 553, 286 Cal.Rptr. 700 (1991); *see United States v. Silva*, 247 F.3d 1051, 1058, n. 4

12   (9th Cir. 2000).

13       California courts have also explained that "officers executing the search warrant were not

14   required to display the warrant or give [the occupant] a copy of it" and "there is no California statutory

15   requirement to exhibit the warrant or give the defendant a copy of it as a prerequisite to its execution."

16   *Calabrese*, 101 Cal.App.4th 79, 84-85, 123 Cal.Rptr.2d 570, 573-574.

17       Defendants are correct that they were not required to present Ms. Saunders a copy of the search

18   warrant prior to executing it to further undermine Ms. Saunders' Fourth Amendment unlawful search

19   claims.  Moreover, in her deposition, Ms. Saunders admits that she saw the search warrant and its

20   attachments during the search of her home.  Ms. Saunders lacks a claim regarding search warrant

21   display.

22                           ***Purse Search***

23       Ms. Saunders complains of Fourth Amendment violation from search of her purse during search

24   warrant execution.  Defendants respond that a warrant is not invalidated by failure to produce direct

25   evidence that the items to be seized will be found at a particular location.  "[T]he nexus between the

26   place to be searched and the items to be seized may be established by the nature of the item and the

27   normal inferences of where one would likely keep such evidence."  *United States v. Anderson*, 851 F.2d

28   727, 729 (4th Cir. 1988), *cert. denied*, 488 U.S. 1031 (1989) (citing *United States v. Jacobs*, 715 F.2d

1   1343, 1346 (9th Cir.1983)).

2   Ms. Saunders' purse was found at a table at the Fashion Fair meeting room, which was described

3   in the search warrant.  The search warrant's Attachment A-1 addressed the meeting room and included

4   all "concealed spaces, storage areas, containers . . ."  The search warrant's Attachment B sought "papers,

5   documents" and "keys" which likely would be located in a concealed place, including a purse or

6   briefcase.  The Attachment B further referred to telephone paging devices, records, receipts, statements

7   of account, bank records, money orders, cashier checks, passbooks, and bank checks – all items likely

8   to be kept in a purse.  Ms. Saunders' purse was within the search warrant's purview.

9   Moreover, the purse search was proper as incident to lawful arrest.  "Unquestionably, when a

10  person is lawfully arrested, the police have the right, without a search warrant, to make a

11  contemporaneous search of the person of the accused for weapons or for the fruits of or implements used

12  to commit the crime."  *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881 (1964).  The right to

13  search and seize without a search warrant extends to things under the accused's immediate control,

14  *Carroll v. United States*, 267 U.S. 132, 158, 45 S.Ct. 280, 287 (1925) and, to an extent depending on

15  the circumstances of the case, to the place where he is arrested,  *United States v. Rabinowitz*, 339 U.S.

16  56, 61-62, 70 S.Ct. 430, 433, 94 L.Ed. 653 (1950)*; Marron v. United States*, 275 U.S. 192, 199, 48 S.Ct.

17  74, 77 (1927); *Agnello v. United States*, 269 U.S. 20, 30, 46 S.Ct. 4, 5 (1925).  The reasonableness of

18  Ms. Saunders' purse search is further supported in that the purse was in plain view in an area subject to

19  her access and the search was immediate upon arrest.  Ms. Saunders fails to substantiate a claim

20  regarding search of her purse.

21                                    ***Cable Box Seizure***

22  Ms. Saunders complains that defendants exceeded the search warrant's scope by seizing two

23  cable boxes which were not mentioned in the search warrant's attachments of items to be seized.

24  Defendants note that Ms. Saunders admitted in her deposition that she did not own the cable boxes to

25  lack standing to pursue a Fourth Amendment claim as to their seizure.

26  Fourth Amendment standing turns on "a determination of whether the disputed search and

27  seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect."

28  *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421 (1978).  The U.S. Supreme Court has further explained

1    that "as a general proposition, the issue of standing involves two inquiries: first, whether the proponent

2    of a particular legal right has alleged 'injury in fact,' and, second, whether the proponent is asserting his

3    own legal rights and interests rather than basing his claim for relief upon the rights of third parties."

4    *Rakas*, 439 U.S. at 139, 99 S.Ct. 421.

5          Generally, an illegal search violates only the rights of those who have a legitimate expectation

6    of privacy in the place searched or property seized. *United States v. Salvucci*, 448 U.S. 83, 91-92, 100

7    S.Ct. 2547, 2552-2553 (1980). Factors to consider include whether the person has a property or

8    possessory interest in the thing seized. *United States v. Briones-Garza*, 680 F.2d 417, 420 (5th Cir.), *cert.*

9    *denied*, 459 U.S. 916, 103 S.Ct. 229 (1982); *see Bumper v. North Carolina*, 391 U.S. 543, 548, n. 11,

10   88 S.Ct. 1788, 1791, n. 11 (1968).

11         Ms. Saunders fails to demonstrate that she had a legitimate expectation of privacy in cable boxes

12   which she admits were not hers. She attempts to champion rights of third parties not at issue here.

13         Moreover, the "plain view" doctrine supports propriety to seize the cable boxes. The plain view

14   doctrine is an exception to the general rule that warrantless searches are presumptively unreasonable.

15   *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 2306 (1990). Pursuant to the plain view

16   doctrine, the Fourth Amendment does not prohibit warrantless seizure of evidence in plain view even

17   though the discovery of the evidence was not inadvertent. *Horton*, 496 U.S. at 130, 110 S.Ct. at 2304.

18   As the U.S. Supreme Court explained in *Horton*, 496 U.S. at 139, 110 S.Ct. at 2309, if a police officer

19   "has a valid warrant to search for one item and merely suspicion concerning the second, whether or not

20   it amounts to probable cause, we fail to see why that suspicion should immunize the second item from

21   seizure if it is found during a lawful search for the first." As noted by defendants, the cable boxes were

22   seized based on reasonable belief that they were illegal under California Penal Code section 593e

23   (unauthorized cable television connections). As such, the cable box seizures fail to support a Fourth

24   Amendment claim.

25                              ***Lack Of Integral Participation***

26         Defendants contend that even assuming a factual issue as to search lawfulness, only Detective

27   Knight played a significant role in the underlying investigation to warrant dismissal of all other

28   defendants.

1    "Section 1983 imposes two essential proof requirements upon a claimant:  (1) that a person

2    acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the

3    claimant of some right, privilege, or immunity protected by the Constitution or laws of the United

4    States." *Leer v. Murphy*, 844 F.2d 628, 632-633 (9th Cir. 1988).  "Section 1983 creates a cause of action

5    based on personal liability and predicated upon fault; thus, liability does not attach unless the individual

6    defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th

7    Cir. 1996); *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises

8    only upon a showing of personal participation by the defendant." )  "The inquiry into causation must be

9    individualized and focus on the duties and responsibilities of each individual defendant whose acts or

10   omissions are alleged to have caused the constitutional deprivation." *Leer*, 844 F.2d at 633.

11       A plaintiff cannot hold an officer liable "because of his membership in a group without a

12   showing of individual participation in the unlawful conduct." *Jones v. Williams*, 297 F.3d 930, 935 (9th

13   Cir. 2002) (citing *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)).  A plaintiff must "establish the

14   'integral participation' of the officers in the alleged constitutional violation." *Jones*, 297 F.3d at 935.

15        Defendants note that only Detective Knight was involved in the probable cause determination

16   relative to Ms. Saunders' search.  Although a member of the Department's vice/intelligence unit, Deputy

17   Bowden's role was limited to surveillance and assistance to serve search and arrest warrants.  The other

18   defendants were not involved in pre-search investigation and as to searches, merely assisted with search

19   warrant execution.  There is no evidence that defendants, other than Detective Knight, knew or should

20   have known that the search warrant lacked probable cause to search the locations.  Line officers "do not

21   have to actually read or even see the warrant; they may accept the word of their superiors that they have

22   a warrant and that it is valid." *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1028 (9th Cir. 2002),

23   *aff'd*, 540 U.S. 551, 124 S.Ct. 1284 (2004).  "It would be a strange and unworkable rule that required

24   a sheriff, at his peril, to determine the ultimate legal validity of every warrant-regular on its face and

25   issued by proper authority-before serving it." *Turner v. Raynes*, 611 F.2d 92, 93 (5th Cir.), *reh'g denied*,

26   614 F.2d 1298 (5th Cir.), *cert. denied*, 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 129 (1980).  Ms.

27   Saunders is unable to establish integral participation of defendants, other than Detective Knight, into

28   probable cause determinations at issue here.  The evidence reveals that defendants who executed the

1  search warrant had been provided sufficient information for such execution.  Ms. Saunders fails to raise

2  a triable issue as to her search claims which in turn fail.

3  **Unreasonable Seizure Claims**

4  ***Excessive Force***

5       Ms. Saunders alleges that she was subjected to unreasonable seizure of her person without

6  reasonable or probable cause.  Defendants contend that they applied reasonable force during their

7  interaction with Ms. Saunders.

8       In *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865 (1989), the U.S. Supreme Court

9  determined that section 1983 excessive force claims are addressed under the Fourth Amendment's

10  reasonableness standard, not the Fourteenth Amendment's substantive due process standard:

11      [A]ll claims that law enforcement officers have used excessive force – deadly or not –
    in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should
12  be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than
    under a "substantive due process" approach.  Because the Fourth Amendment provides
13  an explicit textual source of constitutional protection against this sort of physically
    intrusive governmental conduct, that Amendment, not the more generalized notion of
14  "substantive due process," must be the guide for analyzing these claims.

15  *See also Larson v. Neimi*, 9 F.3d 1397, 1400-1401 (9th Cir. 1993) ("Fourth Amendment rather than

16  general due process, standards appl[y] to claims of unconstitutional seizures of the person. . . . [W]e

17  continue to hold that Fourth Amendment standards must be used when a person asserts that a public

18  official has illegally seized him.")

19       Excessive force is that which "was not 'objectively reasonable' in light of the facts and

20  circumstances confronting the officer." *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002).

21  In *Graham*, 490 U.S. at 396-397, 109 S.Ct. 1865, the U.S. Supreme Court provided guidance on

22  reasonableness of use of force:

23      Because "[t]he test of reasonableness under the Fourth Amendment is not capable of
    precise definition or mechanical application . . . however, its proper application requires
24  careful attention to the facts and circumstances of each particular case, including the
    severity of the crime at issue, whether the suspect poses an immediate threat to the safety
25  of the officers or others, and whether he is actively resisting arrest or attempting to evade
    arrest by flight. . . .

26

27      The "reasonableness" of a particular use of force must be judged from the
    perspective of a reasonable officer on the scene, rather than with 20/20 vision of
    hindsight. . . . The calculus of reasonableness must embody allowance for the fact that
28  police officers are often forced to make split-second judgments – in circumstances that

are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. (Citations omitted.)

Although "reasonableness traditionally is a question of fact for the jury," a defendant can prevail on summary judgment if the court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2612 (1995).  The Ninth Circuit Court of Appeals has observed:

But, as the test of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them. . . . Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . .

Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.

*Scott*, 39 F.3d at 915.

In appropriate cases, courts may consider factors, including whether a warrant was used, the plaintiff resisted or was armed, more than one arrestee or officer was involved, plaintiff was sober, other dangerous or exigent circumstances existed, and nature of charges.  *See Chew v. Gates*, 27 F.3d 1432, 1440, n. 5 (9th Cir. 1994), *cert. denied*, 513 U.S. 1148, 115 S.Ct. 1097 (1995).

Ms. Saunders' claim of unreasonable force on her person is limited to push by Deputy Chapman or Deputy Lenton and Lt. Dadian's denial of Ms. Saunders' request to loosen handcuffs.  The evidence reveals an absence of excessive force.  " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment."  *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.  Handcuff application is common, and handcuffs are inherently uncomfortable to serve their detention purpose.  Arresting officers have no legal obligation to ensure an arrestee's comfort. Moreover, Ms. Saunders lacks evidence of meaningful injury from handcuffs.

Ms. Saunders takes issue with the number of Department officers employed to secure the Fashion Fair meeting room.  "The question is not simply whether the force was necessary to accomplish a

22

1    legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant

2    circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir.) (en banc) (italics in original), *cert.*

3    *denied*, 112 S.Ct. 582 (1991).  Given the number of persons in the meeting room at the time of search

4    warrant execution, there is no evidence of unreasonable conduct to support a Fourth Amendment claim.

5    There is no evidence that the officers drew weapons or otherwise acted unreasonably.

6         Ms. Saunders' demonstrates no unreasonable force with her arrest and securing the Fashion Fair

7    meeting room.

8                                    ***Unreasonable Detention***

9         Ms. Saunders makes no particularized complaints regarding her detention during searches other

10   than to claim her seizure was unreasonable.  Defendants contend there is no evidence of unreasonable

11   detention and that they were entitled to take reasonable action to secure the premises, including detention

12   of Ms. Saunders, to ensure defendants' safety and search efficacy.

13        Defendants point to *Michigan v. Summers*, 452 U.S. 692, 704-705, 101 S.Ct. 2587 (1981), where

14   the U.S. Supreme Court has held detention of occupants during a search is acceptable:

15        If the evidence that a citizen's residence is harboring contraband is sufficient to persuade
          a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally
16        reasonable to require that citizen to remain while officers of the law execute a valid
          warrant to search his home.  Thus, for Fourth Amendment purposes, we hold that a
17        warrant to search for contraband founded on probable cause implicitly carries with it the
          limited authority to detain the occupants of the premises while a proper search is
18        conducted.

19   The high court explained rationale for such detention:

20        Most obvious is the legitimate law enforcement interest in preventing flight in the event
          that incriminating evidence is found.  Less obvious, but sometimes of greater importance,
21        is the interest in minimizing the risk of harm to the officers. . . .

22             . . .

23        . . . The existence of a search warrant, however, also provides an objective justification
          for the detention.  A judicial officer has determined that police had probable cause to
24        believe that someone in the home is committing a crime.  Thus a neutral magistrate
          rather than an officer in the field has made the critical determination that the police
25        should be given a special authorization to thrust themselves into the privacy of a home.
          The connection of an occupant to that home gives the police officer an easily identifiable
26        and certain basis for determining that suspicion of criminal activity justifies a detention
          of that occupant.

27

28   *Summers*, 452 U.S. at 702, 703, 101 S.Ct. 2587.

                                           23

1    The facts of a detention must be viewed in the context of the totality of circumstances in that "the

2    scope of the intrusion permitted [by the Fourth Amendment] will vary to some extent with the particular

3    facts and circumstances of each case." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983)

4    (plurality opinion); *see Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002). A court looks

5    at the situation as a whole and does not isolate each fact "in a vacuum." *Allen v. City of Los Angeles*,

6    66 F.3d 1052, 1057 (9th Cir. 1995); *see Gallegos*, 308 F.3d at 991. In looking at the totality of

7    circumstances, a court considers "the intrusiveness of the stop, i.e., the aggressiveness of the police

8    methods and how much the plaintiff's liberty was restricted . . ., and the justification for the use of such

9    tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of

10   the action taken." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).

11   There is no evidence that Ms. Saunders' arrest and detention was extraordinary and, in turn,

12   unreasonable. No evidence suggests that Ms. Saunders' detention was painful, degrading or prolonged

13   or involved undue invasion of privacy. In the absence of sufficient evidence, Ms. Saunders'

14   unreasonable seizure claims fail.

15   **First Amendment Claims**

16   Ms. Saunders alleges First Amendment violations of her freedoms to assemble, associate and

17   contract. Ms. Saunders complains that Detective Knight caused CCG's "ultimate destruction."

18   ***Freedom Of Association***

19   In *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 656, 120 S.Ct. 2446 (2000), the U.S. Supreme Court

20   explained that a freedom of association claim involves a two-part analysis. First, if the plaintiff has

21   identified an associational right that is impacted by the state action, a court inquires whether the burden

22   on that right is "significant." *Dale*, 530 U.S. at 656, 120 S.Ct. 2446 (finding "that the forced inclusion

23   of [homosexual] Dale would significantly affect" the Boy Scouts' expressive association); *Royer ex rel.*

24   *Estate of Royer v. City of Oak Grove*, 374 F.3d 685, 687 (8th Cir. 2004). If the burden is significant on

25   associational rights, a court must consider whether a compelling state interest justifies the governmental

26   practice. *Dale*, 530 U.S. at 648, 120 S.Ct. 2446 (governmental entity must have a "'compelling state

27   interest[], unrelated to the suppression of ideas, that cannot be achieved through means significantly less

28   restrictive of associational freedoms'" (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 623, 104

24

1    S.Ct. 3244 (1984)); *Royer*, 374 F.3d at 687.  Ultimately, a court must balance these competing interests,

2    and as the U.S. Supreme Court has explained, "'the associational interest in freedom of expression has

3    been set on one side of the scale, and the State's interest on the other.'"  *Royer*, 374 F.3d at 687-688

4    (quoting *Roberts*, 468 U.S. at 658-659, 104 S.Ct. 3244).

5           "[T]he freedom of expressive association, like many freedoms, is not absolute."  *Dale*, 530 U.S.

6    at 648, 120 S.Ct. at 2452.  Nonetheless, the U.S. Supreme Court recognizes the "right to associate for

7    the purpose of engaging in those activities protected by the First Amendment – speech, assembly,

8    petition for redress of grievances, and the exercise of religion."  *Roberts*, 468 U.S. at 617-618, 104 S.Ct.

9    3244; *Royer*, 374 F.3d at 688.

10          Defendants argue that their actions did not affect CCG's ability to advocate viewpoints in that

11   Ms. Saunders was not precluded to sell CCG audio and video tapes uncoupled with the pyramid scheme.

12   Defendants are correct in that their actions targeted the endless chain scheme, not Ms. Saunders' ability

13   to associate and discuss the Constitution.  Defendants' conduct did not significantly interfere with

14   protected First Amendment activities.

15          Moreover, even if defendants' conduct was a significant burden on First Amendment rights,

16   California through peace officers, such as defendants, has a compelling state interest to enforce section

17   327 to avoid public harm.  "[T]he sheriff has a duty imposed by statute to enforce the laws of the state

18   and maintain public order and safety."  *Los Angeles Free Press, Inc. v. City of Los Angeles*, 9

19   Cal.App.3d 448, 456, 88 Cal.Rptr. 605, 611 (1970), *cert. denied*, 401 U.S. 982, 91 S.Ct. 1193 (1971)

20   (citing Cal. Gov.Code, §§ 26600, 26602.)  Moreover, "[w]hen the government wishes to seize written

21   material for any reason other than the content of the material, the first amendment is not infringed."

22   *United States v. Stelten*, 867 F.2d 446, 450 (8th Cir.), *cert. denied*, 493 U.S. 828, 110 S.Ct. 95 (1989).

23   Defendants have demonstrated that the content of CCG and Ms. Saunders' materials was unrelated to

24   investigation into CCG.  Ms. Saunders' freedom of association claim fails.

25                                   ***Freedom Of Assembly***

26          The evidence demonstrates that CCG's purpose was to promote primarily an unlawful endless

27   chain scheme.  In *De Jonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255 (1937), the U.S. Supreme Court

28   explained:

The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.

Ms. Saunders and her fellow CCG participants may be prosecuted for their violation of California laws, including section 327. Defendants did not address Ms. Saunders' participation in a peaceable assembly and public discussion. Defendants conduct focused on an unlawful endless chain scheme. There is no showing that defendants infringed on Ms. Saunders' freedom of assembly, and Ms. Saunders presents no evidence to support that defendants challenged her peaceable assembly and public discussion.

### *Freedom To Contract*

As this Court has noted in a prior order, Ms. Saunders' freedom to contract claim concerns alleged infringement of commercial speech. In *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 557, 566, 100 S.Ct. 2343 (1980), the U.S. Supreme Court explained:

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Ms. Saunders' speech was unlawful insofar as it promoted an unlawful endless chain scheme. Defendants were empowered to exercise a substantial governmental purpose to investigate CCG to enforce section 327 and to protect the public from an endless chain scheme. Ms. Saunders fails to demonstrate that defendants infringed on her commercial speech as to lawful activity.

In sum, Ms. Saunders' freedoms to assemble, associate and contract claims fail.

### **Fifth Amendment Claims**

Ms. Saunders alleges a Fifth Amendment claim that defendants deprived her of life, liberty or property without due process. More specifically, Ms. Saunders alleges that defendants unreasonably

1   delayed progress of the underlying criminal action.

2       Pursuant to the Fifth Amendment, no person "shall be compelled in any criminal case to be a

3   witness against himself."  The Constitutional prohibition against compelling a person to be a witness

4   against himself, made applicable to the states in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489 (1964), is

5   "fully applicable during a period of custodial interrogation."  *Cooper v. Dupnik*, 963 F.2d 1220, 1238

6   (9th Cir.), *cert. denied*, 506 U.S. 953, 113 S.Ct. 407 (1992) (quoting  *Miranda v. Arizona*, 384 U.S. 436,

7   460-461, 86 S.Ct. 1602, 1620 (1966)).  In *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461 (1936), the

8   U.S. Supreme Court established that the Constitution prohibits coercion in pursuit of a statement from

9   a criminal suspect.  The U.S. Supreme Court did so "as a matter of substantive due process of law

10  demanded by the Fourteenth Amendment."  *Cooper*, 963 F.2d at 1244.

11      Here, there is no evidence of Ms. Saunders' coerced statement or that such statement was used

12  against her in the criminal action to violate her Fifth Amendment rights.  Likewise, there is no evidence

13  that defendants unreasonably delayed the criminal action in that defendants lacked involvement in

14  prosecutorial decisions.  Ms. Saunders waived her speedy trial rights and, in turn, her applicable remedy

15  as to delay.  Ms. Saunders' Fifth Amendment claims fail.

16                          **Fourteenth Amendment Claims**

17      Ms. Saunders alleges that she was denied her Fourteenth Amendment rights not to be subjected

18  to loss of life, liberty or property without due process of law.

19                          ***Procedural Due Process***

20      "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a

21  right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689,

22  2692 (1979) (quoting 42 U.S.C. § 1983).  "Section 1983 imposes liability for violations of rights

23  protected by the Constitution, not for violations of duties of care arising out of tort law."  *Baker*, 443

24  U.S. at 146, 99 S.Ct. at 2695.

25      "The Fourteenth Amendment does not protect against all deprivations of liberty.  It protects only

26  against deprivations of liberty accomplished 'without due process of law.'" *Baker*, 443 U.S. at 145, 99

27  S.Ct. at 2695.  "The Constitution does not guarantee that only the guilty will be arrested."  *Baker*, 443

28  U.S. at 145, 99 S.Ct. at 2695.  The U.S. Supreme Court has further explained in *Baker*, 443 U.S. at 145-

                                    27

146, 99 S.Ct. at 2695:

> Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.

Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871.

Defendants correctly note the absence of facts for Ms. Saunders' Fourteenth Amendment due process claim given that such claim appears based on her Fourth Amendment claims. The facts demonstrate that defendants abided by proper procedures and channels to secure the arrest and search warrants. If Fourth Amendment standards have not been breached, a plaintiff is unable to state a claim under the more general Fourteenth Amendment standard. *Simons v. Marin County*, 682 F.Supp. 1463, 1470 (N.D. Cal. 1987). Ms. Saunders lacks an independent Fourteenth Amendment claim based on lack of procedural due process.

### *Substantive Process*

"The concept of 'substantive due process,' semantically awkward as it may be, forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998). The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 1070 (1992).

As a starting point, defendants note the absence of evidence that they engaged in conscience shocking activity. Defendants are correct. The evidence reveals that they properly investigated CCG and focused on Ms. Saunders.

Turning to a potential property interest claim, defendants note the absence of Ms. Saunders' "protected property interest" in continued expectation to downline payments. "A property interest is

28

1   more than a unilateral expectation, it is 'a legitimate claim of entitlement.'" *Brenizer v. Roy*, 915

2   F.Supp. 176, 182 (C.D. Cal. 1996) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701,

3   2709 (1972)).  Entitlements are not created by the constitution, but are defined by independent sources

4   such as state law, statutes, ordinances, regulations or express and implied contracts. *Lucero v. Hart*, 915

5   F.2d 1367, 1370 (9th Cir.1990); *Brenizer,* 915 F.Supp. at 182; *see Coleman v. Department of Personnel*

6   *Administration,* 52 Cal.3d 1102, 1112, 278 Cal.Rptr. 346, 805 P.2d 300 (1991) ("Property interests that

7   are subject to due process protections are not created by the federal Constitution. Rather, they are

8   created, and their dimensions are defined by existing rules or understandings that stem from an

9   independent source such as state law. ")  "If a right has not vested, it is not a property interest protected

10  by the due process or takings clause." *Brenizer,* 915 F.Supp. at 182.

11      In *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972), the U.S. Supreme

12  Court explained:

13          To have a property interest in a benefit, a person clearly must have more than an abstract
            need or desire for it. He must have more than a unilateral expectation of it. He must,
14          instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient
            institution of property to protect those claims upon which people rely in their daily lives,
15          reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right
            to a hearing to provide an opportunity for a person to vindicate those claims.

16

17  "However, the use of substantive due process to extend constitutional protection to economic and

18  property rights has been largely discredited." *Armendariz v. Penman*, 75 F.3d 1311, 1319 (9th Cir. 1996).

19      Ms. Saunders downline payments or expectation of them are not property interests subject to a

20  due process claim.  Ms. Saunders has no legitimate claim of entitlement of downline payments which

21  are prohibited, not mandated, by state law.

22      Defendants further point out that Ms. Saunders lacks a substantive due process claim based on

23  loss of her occupation.  "[T]he liberty component of the Fourteenth Amendment's Due Process Clause

24  includes some generalized due process right to choose one's field of private employment, but a right

25  which is nevertheless subject to reasonable government regulation." 526 U.S. 286, 291-292, 119 S.Ct.

26  1292, 1295-1296 (1999).  However, as defendants note, a plaintiff's loss of employment does not

27  support a substantive due process claim short of prevention to pursue a career on plaintiff's choice in

28  a particular industry. *See Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 474 (9th Cir. 1991)

1   (to state such a substantive due process claim, plaintiff must show that he is unable to pursue a job in

2   the banking profession and that this inability is due to actions that were "clearly arbitrary and

3   unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.");

4   *see also DiMartini v. Ferrin*, 889 F.2d 922, 927 (9th Cir. 1989).

5       The evidence does not suggest that Ms. Saunders was prevented from seeking another multi-

6   market opportunity or other employment.  Her alleged job loss, a potential element of damages, does not

7   support an independent constitutional claim.  Ms. Saunders' Fourteenth Amendment claims fail.

8                              *Equal Protection Claims*

9       Ms. Saunders alleges that defendants denied her equal protection of the laws and that defendants

10  singled her out.

11      "The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny

12  to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that

13  all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*,

14  473 U.S. 432, 439, 105 S.Ct. 3249 (1985).  The "purpose of the equal protection clause of the Fourteenth

15  Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary

16  discrimination, whether occasioned by express terms of a statute or by its improper execution through

17  duly constituted agents." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190

18  (1923).  Equal protection claims may be brought by a "'class of one,' where the plaintiff alleges that she

19  has been intentionally treated differently from others similarly situated and that there is no rational basis

20  for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073

21  (2000).

22      "When a government's action does not involve a suspect classification or implicate a

23  fundamental right, it will survive constitutional scrutiny for an equal protection violation as long as it

24  bears a rational relation to a legitimate state interest." *Patel v. Penman*, 103 F.3d 868, 875 (9th Cir.

25  1996), *cert. denied*, 520 U.S. 1240, 117 S.Ct. 1845 (1997).

26      There is no evidence that Ms. Saunders was subjected to intentional and arbitrary discrimination

27  by defendants or that defendants treated her differently form others similarly situated.  Defendants

28  rationally and properly performed their duties to investigate CCG and Ms. Saunders to result in her

                                        30

1   search and arrest.  The evidence fails to invoke an equal protection issue.

2   <center>**Qualified Immunity**</center>

3         Defendants contend that they are entitled to qualified immunity to bar Ms. Saunders' claims.

4   Qualified immunity is a defense to claims against governmental officials "arising out of the performance

5   of their duties.  Its purpose is to permit such officials conscientiously to undertake their responsibilities

6   without fear that they will be held liable in damages for actions that appear reasonable at the time, but

7   are later held to violate statutory or constitutional rights." *Kraus v. Pierce County*, 793 F.2d 1105, 1108

8   (9th Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571 (1987).  Qualified immunity protects section

9   1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly

10  established statutory or constitutional rights of which a reasonable person would have known." *Squaw*

11  *Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004).  The "heart of qualified immunity is that

12  it spares the defendant from having to go forward with an inquiry into the merits of the case.  Instead,

13  the threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be is true, any

14  allegedly violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995).

15        Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."

16  *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).  The privilege is "an immunity from suit

17  rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is

18  erroneously permitted to go to trial."  *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806.  Courts stress "the

19  importance of resolving immunity questions at the earliest possible stage in litigation."  *Hunter v.*

20  *Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534 (1991).  "Immunity ordinarily should be decided by the court

21  long before trial."  *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

22        The issue of qualified immunity is "a pure question of law."  *Elder v. Holloway*, 510 U.S. 510,

23  514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991).  The Ninth

24  Circuit has explained:

25        Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001),
    the first step in the qualified immunity analysis is "to consider the materials submitted
26  in support of, and in opposition to, summary judgment in order to decide **whether a
    constitutional right would be violated** if all facts are viewed in favor of the party
27  opposing summary judgment." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).  "If
    no constitutional violation is shown, the inquiry ends."  *Cunningham v. City of*
28  *Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003).  On the other hand, if "the parties'

<center>31</center>

1   submissions" create a triable issue of whether a constitutional violation occurred, the

2   second question is "**whether the right was clearly established**." *Saucier*, 533 U.S. at
    201, 121 S.Ct. 2151. A constitutional right is clearly established when "it would be clear
3   to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*
    at 202, 121 S.Ct. 2151.

4   *Squaw Valley*, 375 F.3d at 943 (bold added).

5   The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official

6   would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the

7   unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987).

8   "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the

9   immunity defense." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

10   Qualified immunity "turn[s] primarily on objective factors": "Reliance on the objective

11   reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid

12   excessive disruption of government and permit the resolution of many insubstantial claims on summary

13   judgment." *Harlow v. Fitzgerald*, 457 U.S. 808, 818, 102 S.Ct. 2727 (1982). The qualified immunity

14   standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or

15   those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 343, 341, 106 S.Ct. 1092 (1986). "If

16   the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment

17   based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156-2157.

18   Turning to search warrant affidavit preparation, an officer's application for a warrant is not

19   objectively reasonable if a reasonably well-trained officer would have known that his/her affidavit failed

20   to establish probable cause and that he should not have applied for the warrant. *See Malley*, 475 U.S.

21   at 345, 106 S.Ct. 1092. In *Hervey*, 65 F.3d at 789, the Ninth Circuit explained:

22   In sum, a plaintiff can only survive summary judgment on a defense claim of
    qualified immunity if the plaintiff can *both* establish a substantial showing of a deliberate
23   falsehood or reckless disregard and establish that, without the dishonesty included or
    omitted information, the magistrate would not have issued the warrant. Put another way,
24   the plaintiff must establish that the remaining information in the affidavit is insufficient
    to establish probable cause.

25

26   As noted above and viewing the evidence in her favor, Ms. Saunders has failed to establish that,

27   or raise a factual issue whether, defendants deprived her of a constitutional right. As such, the inquiry

28   need go no further that defendants are entitled to qualified immunity. More specifically, as to Detective

32

1    Knight, there is no evidence of her deliberate falsehood or reckless disregard regarding her search

2    warrant affidavit.  Viewing the record in Ms. Saunders' favor, there is no factual dispute that Detective

3    Knight's affidavit satisfied probable cause requirements.  Defendants have established that CCG and Ms.

4    Saunders' activities revealed potential section 327 violations to invoke defendants' legitimate conduct.

5    Nothing suggests that reasonable officers in defendants' positions would have acted differently.

6    Defendants are entitled to qualified immunity.

7                                    **Claims Against Sheriff Pierce**

8                                        *Individual Capacity*

9           Defendants contend that Sheriff Pierce is liable in neither his individual nor official capacity in

10   the absence of facts that of his involvement or service as Department Sheriff during the underlying

11   investigation.

12          Individual capacity liability under section 1983 arises only upon a showing of personal

13   participation by the defendant.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Fayle v.*

14   *Stapley*, 607 F.2d 858, 862 (9th Cir.1979)).  A supervisor is only liable for constitutional violations of

15   his subordinates if the supervisor participated in or directed the violations, or knew of the violations and

16   failed to act to prevent them.  *Taylor*, 880 F. 2d at 1045.  There is no respondeat superior liability under

17   section 1983.  *Taylor*, 880 F.2d at 1045 (citing *Ybarra v. Reno Thunderbird Mobile Home Village*, 723

18   F.2d 675, 680-81 (9th Cir.1984)).

19          The undisputed facts demonstrate that Sheriff Pierce was not involved in the underlying CCG

20   investigation, received no reports about it until after search warrant execution, and did not participate

21   in search warrant execution.  There is an absence of a necessary actual connection or link between

22   Sheriff Pierce and Ms. Saunders' alleged constitutional deprivations.  *See Monell v. Department of*

23   *Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598 (1976).

24                                         *Official Capacity*

25          Official-capacity suits represent a means to plead an action against an entity of which an officer

26   is an agent.  *Monell*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018.  Local government officials sued in their

27   official capacities are "persons" under section 1983 in cases where a local government would be suable

28   in its own name.  *Monell*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018.

                                                    33

A local government unit may not be held liable for the acts of its employees under a respondeat superior theory. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; *Davis v. Mason County*, 927 F.2d 1473, 1480 (9th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 275 (1991); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989).  "[A] municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2018.  The local government unit "itself must cause the constitutional deprivation." *Gilette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992), *cert. denied*, 510 U.S. 932, 114 S.Ct. 345 (1993).  Because liability of a local governmental unit must rest on its actions, not the actions of its employees, a plaintiff must go beyond the respondeat superior theory and demonstrate that the alleged constitutional violation was the product of a policy or custom of the local governmental unit. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-480, 106 S.Ct. 1292 (1986).  To maintain a section 1983 claim against a local government, a plaintiff must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind the constitutional deprivation). *Monell*, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

A plaintiff can establish a "policy or custom" by showing: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Gable*, 296 F.3d at 537; *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994).  "[O]fficial policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445 (1981) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018)); *see Rizzo v. Goode*, 423 U.S. 362, 370-377, 96 S.Ct. 598 (1976) (general allegation of administrative negligence fails to state a constitutional claim cognizable under section 1983).  A "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bryan County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382 (1997).  A plaintiff must demonstrate that a defendant's policy was

34

1    "closely related to the ultimate injury." *Harris*, 489 U.S. at 391, 109 S.Ct. at 1206. "At the very least

2    there must be an affirmative link between the policy and particular constitutional violation." *Oklahoma*

3    *City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427 (1985).

4        There is no connection to Sheriff Pierce to the pre-search and pre-arrest investigation into CCG.

5    Sheriff Pierce did not take office until January 4, 1999, the day preceding Ms. Saunders' search and

6    arrest. There is no evidence of a policy or custom giving rise to Ms. Saunders' claims let alone

7    promulgated by Sheriff Pierce. Sheriff Pierce took no official or other action to support a section 1983

8    claim against him.

9        **Ms. Saunders' Summary Judgment/Adjudication Motion**

10        This Court construes Ms. Saunders' papers to seek summary judgment/adjudication that

11    Detective Knight violated Ms. Saunders': (1) Fourth Amendment rights based on Detective Knight's

12    false statements of probable cause in Detective Knight's search warrant affidavit; and (2) First

13    Amendment rights by targeting and arresting Ms. Saunders. Ms. Saunders appears to question the

14    investigation and related matters preceding her search and arrest and whether Ms. Knight is entitled to

15    qualified immunity. As demonstrated above, defendants have revealed an absence of evidence to

16    support Ms. Saunders' claims which are barred as a matter of law and by defendants' entitlement to

17    qualified immunity. Ms. Saunders' fails to support her summary judgment/adjudication motion, which

18    is denied.

19        **CONCLUSION AND ORDER**

20        For the reasons discussed below, this Court GRANTS defendants summary judgment and

21    specifically determines that defendants are entitled to qualified immunity and that Ms. Saunders has

22    failed to establish viable: (1) Fourth Amendment unreasonable search and seizure claims; (2) First

23    Amendment claims for violation of freedoms to assemble, associate and contract; (3) Fifth Amendment

24    due process claims; (4) Fourteenth Amendment due process and equal protection claims; and (5) Section

25    1983 claims against Sheriff Pierce. This Court further DENIES Ms. Saunders' summary

26    judgment/adjudication motion and DIRECTS the clerk to enter judgment against plaintiff Sharon

27    Saunders and in favor of defendants Cynthia Knight, Richard Pierce, Mark Chapman, Neil Dadian, Earl

28    Richardson, Janice Rasmussen, Ken Bowden, Dale Baumann, Mike Severson, Patrick Hanson and Juan

1   Espinoza.  This Court further DIRECTS the clerk to close this action and VACATES the January 14,

2   2008 trial.

3          IT IS SO ORDERED.

4   **Dated:    November 8, 2007**          _____**/s/ Lawrence J. O'Neill**_____
                                            UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28